The next case today, number 241590, Crosspoint Church v. A. Pender Makin, et al. Will counsel for the appellant please come up and introduce yourself on the record to begin? Good morning, Your Honors. Tiffany Bates for Appellant Crosspoint. May it please the Court, and I would like to reserve three minutes for rebuttal, if I may. Yes, three minutes. In 1980, the Maine Attorney General told the Maine Legislature that allowing religious schools to participate in the state's tuitioning program violated the First Amendment's Establishment Clause. The Legislature then excluded these schools from the tuitioning program. When Maine lost in Carson v. Makin, and the Supreme Court invalidated the sectarian exclusion, the Attorney General issued a statement identifying Bangor Christian schools, calling its religious beliefs inimical to a public education, and promising to work with the Legislature and Governor to continue excluding BCS and other religious schools from participating in the program. The Legislature also responded by making several changes to the law to accomplish what it could not in Carson, to exclude these religious schools from participating in the tuitioning  The state's ongoing efforts to prevent these schools from participating violates the Constitution for three reasons. First, Section 4602 violates the Free Exercise Clause because it burdens BCS's religious exercise and is neither neutral nor generally applicable. The state appears to believe that BCS can separate its religious beliefs from its religious identity. It cannot. Religious beliefs are what establish its religious identity, and BCS has a right to exercise its beliefs about sexuality and gender, even if the state finds those views distasteful. As the Supreme Court emphasized in Obergefell, the First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles about sex and marriage that are so fulfilling and so central to their lives and faiths. If I might interrupt you, and could we jump to the ripeness question, and could you specifically speak a little bit about how far we can analogize to the White House case, and specifically I'm wondering whether there's any significance to third-party actors such as students and employees in this case. Does that distinguish this case a little bit from White House? So Your Honor, the District Court found BCS's claims were ripe under White House, and that was the correct decision. So there are a couple things at play here. BCS has shown that it has an intent to participate in the program, that its policies, as the District Court found, plainly run afoul of the anti-discrimination provisions, and that its fear of enforcement is eminently reasonable. I think the only thing in contention here is the fear of enforcement. That's the only thing in dispute, and the District Court thought this was an easy question, given the timing of the amendments, the then-Speaker of the House's tweets, and the Attorney General's statements made during and after Carson would reasonably cause the plaintiffs to conclude that he would pursue them. So let me just go back to my question, though, because I know what the District Court said, but does the addition of, so here, a student would, I assume the schools all would qualify for the program, but you still need to have a student to apply and be not accepted. So does that make this case a little bit different from White House, or is it on all fours? No, Your Honor, because the state raised those same arguments in Carson, and both this Court and the Supreme Court rejected those and went to the merits. And this case is stronger than Carson, because it is the schools themselves that are knocking at the door this time around. Well, how about for the employment restrictions? As I understand it, your position is those don't apply to your clients, and the state's position is those don't apply to your clients. Well, respectfully, Your Honor, we still fear a threat of enforcement that the state is going to enforce these provisions, because they clearly have not disclaimed that they would. And both in this Court and in the Supreme Court in Carson, the state argued that schools would lose their ability to hire co-religionists, and in this case, in the District Court briefing, they still separate out and say that if the school were to deny a homosexual person, for example, on the religious basis, that that could go to the courts. And we still fear that the state is going to enforce that. We don't think, as the District Court found, that they've disclaimed this. What do you say, if I could take you to the test of generally applicable and neutral, the focus on those two. On generally applicable, as I understand it, your only argument is that some provisions of the legislation don't apply to post-secondary schools, colleges, universities, and don't apply to schools outside of Maine. Have I got that correct? Yes, Your Honor, and we think that's fatal to the general applicability here. Maine's interest, it is stated, is to make sure that public funds don't go to promoting discrimination, yet they have not required schools outside the state to abide by those anti-discrimination laws. Does it depend how we define the universe here, to ask whether something is generally applicable? Well, I think the universe is based on, the comparator is based on what the state has asserted its interest in. And here, it said its interest is ensuring the public funds don't go to institutions that are discriminating on these bases. But it's not applying those, to example, for schools outside the state. Those schools do not have to, do not have to abide by the non-discrimination provisions. And theoretically, the state could, you know, could, in a contract with them, say, by agreeing to these terms, you agreed to abide by these non-discrimination laws. Why would we define the universe with respect to a factor that is not religion-based? In other words, if the state says, well, we're not going to worry about pre-K, and we're not going to worry about schools that are, someone's going overseas, all of a sudden, does that make it not generally applicable? As opposed to saying, all religious schools are treated the same. If they're in the state X, if they're outside the state Y, all non-religious schools are treated the same way. Well, I think, still, Your Honor, you have to look at what the state's, has asserted interest is, is promoting. That just means that the interest doesn't trump all other interests in all other circumstances. But I'm not sure how it says that the statute isn't generally applicable within the zone that the state is focusing on. Respectfully, Your Honor, I think our belief is that the comparator should be the state's interest, and that's not being met here. Should we include pre-K? I'm sorry, could you return the question?  Suppose it applied to all schools except pre-K schools for three-year-olds. Would we, therefore, say it's not generally applicable? I think there's probably a realm in which the state can make these choices, but that very well could make it not generally applicable. And so why could you make that choice, that carving out three-K doesn't render it not generally applicable, and yet you cannot carve out post-secondary schools on the same sort of rationale? Respectfully, Your Honor, I think it all still has to do with the state's interest here. If I could turn to the targeting. Judge Selye, do you have a question? No, it's just that that wasn't an answer to Judge Galliard's question. I don't understand why you would carve out three-K schools on the same sort of rationale. Why would you carve out three-K, but not post-graduate, but vice versa? That's distinguishing characteristics. I mean, I... Excuse me, Your Honor. Your position is different. I think I have nothing else to add here other than we think the comparability is to Maine's interest, and Maine imposes these requirements on public colleges but not private ones. They still receive these funds, and on in-state religious schools and not out-of-state ones. Do you want to speak briefly on whether eliminating discrimination is a compelling state interest, and in particular, I think Maine's opposition brief cites a number of cases setting out why discrimination would be a compelling state interest. What's your position on that? Sure, Your Honor. We don't think there's a compelling state interest of the highest order of the sort like there is in race. The Supreme Court has not said there's a compelling interest of the highest order in regards to sexual orientation and gender identity. And, you know, the state points to Bob Jones, but Bob Jones had a specific... The government's interest there was not a broad interest in preventing discrimination. It was a targeted interest in combating the 165 years of racial discrimination that the state had participated in in those cases. So we think they're different, and a broad interest in discrimination can't trump that. And, you know, the Supreme Court has rejected that broad interest in anti-discrimination in at least four cases, Hurley, 303 Creative, Dale, etc. Your Honors, we think the District Court failed to undertake the careful analysis that Lukumi requires. There's a Justice Kennedy opinion, and he emphasizes that courts need to do a searching analysis that wasn't done here. So we think this Court... Please finish your thought. ...must look at the text of the amendments, must meticulously review the law's real operation, how it works in conduct, and must carefully review the direct and circumstantial evidence about the lawmakers' motives. And we think the text itself, the structure of the law, the timing, in addition to the statements by the then Speaker of the House, the Attorney General, and some public commentary in the New York Times identifying motives are all relevant. So even if you don't think those statements can stand on their own, the timing and structure and text of the law still burden our religious exercise. Thank you. Thank you, Counsel. Will Attorney for Appelese please come up and introduce yourself on the record to begin? Good morning, and may it please the Court. I'm Christopher Taub. I'm the Chief Deputy at the Maine Attorney General's Office. And with me, both on the briefs and at Council table, is Sarah Forster, Assistant Attorney General. In Carson v. Macon, the Supreme Court held that Maine cannot exclude private religious secondary schools from its school tuitioning program. Since that decision, Maine has treated religious schools exactly like non-religious private schools in the tuition program, and one religious school is currently participating in its third year of receiving tuition funds. But CrossPoint is not looking for equal treatment. It's not looking to be treated equally to non-religious schools. It's looking for preferential treatment, and specifically, it wants to be exempted from complying with the Maine Human Rights Act, even though every other school that receives public tuition payments in the program must comply with that law. Nothing in the Constitution requires the state to exempt CrossPoint from a neutral and generally applicable anti-discrimination law with which every other school must comply. Well, we know as a starting point that the state can't say, because of the prior Supreme Court decision, the state can't say, we're not giving you funds because you're a religious school. So that's sort of our starting point, and we then have to think, how, if at all, does that apply to the different scenario here that you point out? And I'd be interested in how you think we should explain if you view a private religious school as likely having as its primary reason for being, primary mission, the proselytizing or urging of the adoption of a particular belief set or faith, then how does the state coming in and saying, you can't do that if you get funds? That seems to be almost the equivalent of saying, you can't do that if you're a religious school. Well, we would disagree, Your Honor. First of all, I think it's important to point out that religious schools have an option. They can either continue their practices as they wish, or they can choose to accept the public funds. And so that's a condition that they agree to as part of accepting public funds. But that's true of the Carson case. They could stop being religious and take the funds. Right, but the Supreme Court said that's different, Your Honor, because the Supreme Court said that you can't draw distinctions based on religious status. And so that's not what's going on here. But I think the other thing that's important to keep in mind is that we are not saying to religious schools that you have to stop proselytizing. We're not telling them what they have to teach. It's no longer a one-way street if they accept funds. They have to allow reverse proselytizing back. Well, it's not really clear exactly what they have to require. And I think the provision that you're referring to is the provision that talks about allowing religious expression. It's not completely clear how a state court would interpret that. But, for example, it could mean simply that if students want to privately discuss their own religious beliefs, they should be allowed to do that. I don't think a state court would interpret it as saying that students have the right to get on the PA system in the morning and proselytize their own religion. And I think the other point to keep in mind is, again, schools are free to teach however they want. They're free to teach anything they want about their religion. They're free to teach things, for example, about what a proper marriage is or how God ordains a person's gender. Our law would not prevent them in any way from doing that. The point is, if they do that under the law, it comes with a price, right? The price is they must then allow expression of religious indications from others in the school that don't jive with what the school is propagating. That's the price. Your Honor, so again, it's not clear what that religious expression means, but I think the other important point is they still have to show how that burdens their religious practices. And so what CrossPoint has failed to do is how simply allowing students to express their own religion, whether it's wearing religious jewelry or talking privately with their friends about their religious beliefs, they have not demonstrated how that burdens CrossPoint's religious practices. And so I think that's what's important to keep in mind, is that is really the test for the free exercise claim. I mean, suppose a Catholic school, a student group formed and was lobbying in the school Catholics for pro-choice. Could the school not prevent, could a Catholic school not tell the students that they shouldn't do that if they want to be at a Catholic school? Yeah, I mean, that's a question that we don't know the answer to, and I think that goes into... Well, if you're a school and you look at the statute, you would conclude there's a chance I'm going to be held liable if I do that, isn't there? Yes, I mean, I would say that it's possible that a state court would conclude that a school has to allow that, but we don't know if that's the case or not, because this has not been interpreted by a state court, and that's part of the reason why this case is really premature and not right. We don't have any actual action where we can look at a specific instance and decide whether or not that is something that the school should be allowed to do or whether that's something that the Human Rights Act should prevent them from doing. We're really just talking in hypotheticals, and so we can throw out a lot of different hypotheticals, and some of them are going to fall on one side of the line and some of them might fall on the other side of the line, but that's the challenge of this. We don't have an actual controversy in front of us. Doesn't that create sort of a chilling problem? Because you're the school, and you're saying, can we do this? And someone says, well, I just heard the Attorney General from Maine say, maybe you can, maybe you can't take your chances, knowing that if they take their chances and they can't, they're going to get large fines. Well, I think, Your Honor, is the mere fact that a school might be chilled, that's not sufficient for this Court to exercise jurisdiction over the matter. The Court doesn't have jurisdiction simply because a school wants to get an advisory decision ahead of time to tell it what it has to do or what it's prohibited from doing. And so, you know... In First Amendment cases, we regularly take on cases prospectively where there's a chilling effect. Well, I think what's different is we have very specific conduct at issue. So, for example, in the Rhode Island Realtors case that I think the Court was addressing before, that was something very specific. It was an entity saying, we've gotten these records from a public access request and we want to use them for solicitation purposes, but the statute expressly says we can't do that. And so there, there was no third party intermediary, there was a direct plan of action, we are going to use these records for this purpose, the statute says we can't do it, and so this Court said that is a ripe controversy. This is different. What we have here is Crosspoint saying, we want to participate in the program, but whether or not it actually ends up engaged in an unlawful act is going to entirely depend on the actions of third parties. So it would depend, for example, on whether a gay child applies to Crosspoint and is rejected, or whether a transgender child applies to Crosspoint and is rejected. It doesn't that lead us, if we go that route, do we end up with an entanglement problem? Because the very fuzziness that you're talking about means that some state actor, whether the Attorney General or a court, is going to have to get in to saying, well, is what the school said religious expressionism, and is what the students said religious expressionism, and how does it conflict, and then how do we fit that into the statute? It seems that the very attempt to resolve that fuzziness that you refer to would involve the state in making quite a bit of judgments about what's religious, what's contrary to religious belief, etc. We would disagree with that. Just as an initial matter, there is some level of entanglement that the Supreme Court has expressly authorized. So, for example, in looking at the ministerial exception, courts are getting very involved in the nature of the position and how that position fits into the religious purpose. Stepping back from that, though, Your Honor, there's no entanglement here, because the state is not going to be looking at, did you refuse to admit this gay child because of your religious beliefs? It's just going to be looking at, did you reject this child because the child is gay? And so it's going to be looking at factors like, did you first admit the child and then find out the child was gay and rescind admission? Have you rejected other gay children? Now you've moved to the admissions issue, and I understand that's another issue, but that's not really what we're talking about here. We're talking about the expressionism issue that would create the entanglement problem. So, again, Your Honor, it's very hard to address the religious expression provision, because we don't know exactly what that rises to the level of. But if, for example, a child came to a Christian school wearing a Star of David and the school said you can't do that, I suspect that that would be a violation of that religious expression provision, but there wouldn't be any entanglement involved. It would just be the state saying, you know, if you're wearing a Star of David, that means that you prohibited this child from engaging in religious expression. So there's not going to be any entanglement into why you didn't allow the child to do that or what your church doctrines are. It's going to be just a very, very basic, you know, did you or did you not prohibit this child from expressing themselves? So you do read the statute as prohibiting Christian religious schools from suppressing student opinions that question whether Christ is the Son of God. So, again, I mean, because a court hasn't looked at the statute and because the Maine Human Rights Commission hasn't interpreted it, it's difficult for me to speculate, but... How would you justify... I would say, Your Honor, that if one child in a Christian school wants to talk to another Christian child, you know, at the cafeteria or during recess or at, you know, and says, hey, you know, I don't really agree with some of these Christian beliefs that they're teaching us. Let me tell you about what some of my beliefs are. I think if the school prevented that from happening, that would be a violation of the Maine Human Rights Act. Now, what I think is much more questionable is whether, for example, a student wanted to form a club or a student wanted to hold, you know, some kind of prayer session over the PA system or wanted to do some sort of, like, public forum type event. I think that's a much different situation. And what language in the statute differentiates between those two examples you just gave? Well, I mean, all the statute says is that if a school allows religious expression, it can't discriminate among religions with respect to that. And I think what the intent is is to sort of capture the same paradigm that public schools operate under, which is public schools have to allow some level of religious expression. So is it fair to read that language, I think it's 406, 46025D, right, as saying either permit all religious expression or none? I think that's what it says, and I think the question on it is what does it mean to engage in religious expression? And I think that's what we really don't have a good answer to at this point. If you look at the language of that statute and the word permits in the last sentence, you read that as the object being student speech. Yes. Could there be another object? So school institutional speech, say, or is that just not how you're reading the permits? That's not how I would interpret it, and I don't think that's the most natural reading of it. There's no legislative history. We really don't know exactly what this provision is intended to capture, but I do think that at least part of the idea is that it was intended just to essentially protect the free expression rights of the children, just like public schools have to do. And the other reason I say that is because it expressly says that a religious school doesn't have to endorse or participate, I think are the words, but it expressly says that religious schools don't have to express or endorse. And so I think what it's trying to get at is just the religious expression of the children themselves. The actual language, if I have it right, is that the schools don't have to do any religious expressionism, which would be odd for a religious private school. But if they do, then to the extent that the school permits religious expression, it cannot discriminate between religions in doing so. That would seem to say that whatever expressionism it does, it's got to allow opposing students that's contrary expressionism to that same extent. Yeah, I would disagree, Your Honor. I think what it's saying is to the extent that you allow student religious expression, you can't discriminate among religions when you do that. I don't think it's imposing any kind of directive or requirement on the schools themselves. So you would point us to the word permits as implying that it's referring to what it permits students, not what it does itself? Yes. And just briefly, Your Honor, on the issue of the law being generally applicable, I think it's important to point out that it's not a situation where this statute is expressly exempting out-of-state schools. Instead, it's just the fact that out-of-state schools aren't subject to the jurisdiction of the Main Human Rights Act that results in those schools not being covered. So I think this is different than cases where a state has expressly carved out an exception. Having said that, I think the point, and I think Judge Cata, you were asking about this before, is religious schools are going to fall on both sides of that line. This is a geography line, and so religious schools that are out-of-state are going to be just as exempt from the Main Human Rights Act as are non-religious schools. Thank you. Thank you very much. Will counsel for appellant please come up and reintroduce yourself on the record? You have a three-minute rebuttal. May it please the Court, Tiffany Bates for Appellant Crosspoint Church. Could you address that language in Section D and how you read permits? Yes, Your Honor. We think that that directly regulates the schools, and this brings me back to one of my points about what the religious exercise is here. The school engages as an institution that has unified beliefs and is developing a shared community in order to instill these values in students, and we think that language in Section 5D regulates, infringes on that by requiring, by the plain language of the statute, the school to allow religious speech against its mission and against its beliefs. A couple other points, Your Honor. The state says that we are seeking special benefits here, and that is not the case. The idea that these sorts of programs are special benefits has been rejected by the Supreme Court again and again over the last decade in Trinity Lutheran, Espinoza, and Carson. The state may not like that that's where the law is, but that's where it is. And the entire story of this case and of Carson is main trying to keep out religious schools from participating in this program. They have fought tooth and nail every step of the way. Indeed, in the District Court, the state even refused to admit that the sectarian exclusion was unenforceable after Carson. The District Court wrote a very long footnote to that effect. My friend also, I think, made a big concession on standing saying it was possible that the law could be interpreted as we do, but I don't think we have to wait to find out on the penalty of hundreds of thousands of dollars. As soon as we become approved for tuition purposes, we become subject to the Maine Human Rights Act. And under this record, especially, we have the state saying that our beliefs are bigoted, discriminatory, inimical to a public education, and that they would do what they can to keep BCS in particular and other religious schools from accepting these programs. What's the hardship you face if we conclude that the case isn't ripe? If you find the case isn't ripe, then we won't be able to participate in the program because we're not willing to, we would be violating the MHRA and our beliefs if we had to, if we applied for the program and then become subject to the law. We ask court to reverse. Thank you. Thank you, Counsel. That concludes arguments in this case.